609 S.E.2d 572

**The STATE, Respondent,**

v.

**Henry FLETCHER, Appellant.**

**No. 3940.**

Court of Appeals of South Carolina.

Submitted Jan. 1, 2005.
Decided Jan. 31, 2005.
Rehearing Denied March 17, 2005.
Rehearing Denied April 21, 2005.

228

230

234

Robert E. Lominack, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor Warren B. Giese, of Columbia, for Respondent.

ANDERSON, J.:

Henry Fletcher appeals his homicide by child abuse conviction. He argues the trial court erred in refusing to (1) exclude evidence of prior bad acts; (2) suppress evidence obtained through a search warrant; (3) redact additional information

from his co-defendant's statement; and (4) exclude photographs of the victim. We affirm.[1]

## FACTUAL/PROCEDURAL BACKGROUND

Around 1:15 p.m. on September 21, 2000, nine-month-old Jaquan Perry presented at the Palmetto Richland Memorial Hospital emergency room in full cardiopulmonary arrest. After medical personnel placed the infant on a ventilator, medicated him to maintain his blood pressure, and repeatedly attempted to resuscitate him, they pronounced him dead at 4:20 p.m. During treatment, CT scans were performed and x-rays were obtained. The tests revealed injuries throughout Jaquan's abdomen—including internal bleeding, bruises to the liver, bowels, pancreas, and little blood flow to the kidneys, spleen, and liver.

The police investigated Jaquan's death. Columbia police officer Joe Smith interviewed hospital personnel about Jaquan's injuries. When Officer Smith talked with Jaquan's mother, Ikeisha Perry, she told Smith that Jaquan fell from a bed. In her written statement, Perry declared she picked Jaquan up, comforted him, and brought him with her while she ran errands. Perry said she noticed something was wrong when they left the dentist's office. She could not hear Jaquan's heart beating. Perry then drove Jaquan to the hospital. Her live-in friend, Henry Fletcher, attempted CPR as she drove to the hospital.

When asked by Officer Smith whether she had ever beaten or spanked Jaquan, Perry claimed she had "popped" Jaquan but "[a]s far as beating him to bruise him, no I haven't." Perry admitted Jaquan had been handcuffed to a bedpost.

Fletcher provided statements to the police. In the first of two statements, Fletcher said Jaquan fell out of the bed on the morning of September 21, 2000. He noted: Jaquan did not "look right" when they left the dentist's office; they did not hear Jaquan's heartbeat; and they drove to the hospital immediately, with Fletcher attempting to resuscitate Jaquan on the way. Fletcher maintained that sometimes he would

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

"play fight" with Jaquan. In a later statement, Fletcher denied ever hitting Jaquan, but admitted he put some of his weight on Jaquan when they wrestled although he was not sure if doing so hurt Jaquan. Fletcher professed he hit Jaquan twice with his fists. At trial, Fletcher testified this statement was made in a sarcastic tone and was not meant to be taken as truth.

As part of the investigation, the police executed a search warrant of the home in which Perry and Fletcher lived. They seized a pair of handcuffs, went into the attic, and took photographs of the residence.

Fletcher and Perry were both arrested and charged with homicide by child abuse. They were indicted and tried.[2] Before jury selection, the trial court heard several motions, including motions to exclude evidence of prior bad acts and to suppress evidence found in connection with an allegedly invalid search warrant. The motions were denied.

Jaquan suffered injuries to his internal organs, which caused an infection that led to his death. The testimony of two witnesses who observed Jaquan indicated that Jaquan's eyes were half-closed and he was pale and non-responsive on the morning of September 21. One of the witnesses, Kimberly Hampton, related that Jaquan was making a strange breathing sound, one she characterized as "a death gurgle." By noon, when Perry brought Jaquan with her and her other child to the dentist's office, a witness noticed that Jaquan looked sick and pale but the witness did not hear unusual breathing sounds.

The State and Fletcher disagreed as to which injuries should have been included in the testimony. The State introduced evidence of two instances of abuse, which Fletcher describes as occurring "prior to that which caused Jaquan's death on September 21st." About three or four weeks prior to September 21, Carlos Jenkins visited Fletcher's home and found Jaquan handcuffed to a bed. Approximately two weeks before September 21, Jenkins returned to Fletcher's house and discovered Jaquan alone in the attic, crying and sweating profusely. Jaquan's ribs had been injured and were healing

---

**2.** Over defense counsel's objection, the trials of Fletcher and Perry were not severed.

suggesting the injuries had been sustained about two weeks before Jaquan died. However, Jaquan's being handcuffed and left in a hot attic did not cause his death.

The medical evidence provided more details about Jaquan's injuries and offered information regarding the cause of his death. Dr. Timothy P. Close, a radiologist, testified the injuries revealed by the scans and x-rays were inflicted at different times and Jaquan's rib fractures were "[p]robably not" caused by Fletcher's alleged resuscitation attempts. Dr. Close estimated some of the rib fractures were as recent as a few hours to a few days old and other, older fractures were ten days to more than two weeks old (with some of the ribs having been broken twice). He declared the liver injuries were likely caused within forty-eight hours of Jaquan's death and the bowel injuries occurred at least twelve hours or more before Jaquan's death. He stated the injuries were inconsistent with either a fall from a bed or with a single blow ("most likely" multiple blows to the front of Jaquan). Rather, his injuries were caused by a force equivalent to ejection from a car involved in an accident when the car had been traveling sixty to seventy miles per hour or a fall from a three or four story building.

Dr. Robert D. Hubbird noted when Jaquan arrived at the hospital his abdomen was "very, very distended and protuberant," he had multiple rib fractures, a ruptured bowel which caused an infection or sepsis, and such significant damage to his liver that it "was dying." Dr. Hubbird explained the internal bleeding had been going on for days; the injuries had been caused over a period of days; and the ribs had been injured at different times. He testified the abdominal and back bruises occurred at different times, with some green bruises, which indicated they were "five to seven, [even] ten days old." Dr. Hubbird expounded that some of the bruises could have been caused by resuscitation attempts but others were not. He declared that the cause of the injury must have been "incredibly concentrated striking, a very powerful blow" to have caused the damage—destroyed bowel wall, ruptured bowel, disrupted liver—and must have been more than one blow. He articulated blunt force might not leave a bruise each time because the body sometimes absorbs the force. Dr. Hubbird opined Jaquan died from "child abuse from massive

intra-abdominal injuries; massive injuries to kill the bowel, caused widespread infection, killed the liver."

The autopsy yielded additional information. Dr. Jeffrey Allen Welsh performed the autopsy. The autopsy demonstrated several bruises on Jaquan's back and a distended abdomen. A "tense" abdomen is abnormal in a child. Dr. Welsh confirmed resuscitation attempts may have caused some of the chest bruises. After reviewing x-rays and CT scans and performing an external and internal examination, Dr. Welsh determined the cause of death was from blunt abdominal trauma, which caused infection that ultimately led to Jaquan's death. He found, based on the scar formation on the internal organs, the injuries occurred at least forty-eight hours before death and likely earlier than that, with the injuries occurring at different times. Dr. Welsh opined the type of force necessary to inflict the trauma evidenced on Jaquan's body "would have been significant because the injuries to the liver, for example, are those described mainly with motor vehicle type accidents." Dr. Welsh concluded the injuries Jaquan sustained were consistent with battered child syndrome. Dr. Welsh enunciated that Jaquan's injuries would have caused great pain and lethargy, making it obvious Jaquan needed medical attention.

Fletcher presented evidence that: (1) he was not aware Jaquan had been handcuffed to the bed; (2) Perry sometimes left Jaquan in the attic while she dried her laundry up there; and (3) the attic had an air conditioning vent near the door. Fletcher professed he had never "beat" Jaquan. Perry introduced evidence that Jaquan was not injured before early September; rib fractures in children are not uncommon; and Perry's mother saw Jaquan the day before he died and did not notice anything wrong.

The jury found both Fletcher and Perry guilty of homicide by child abuse. Fletcher was sentenced to life in prison.

### STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001); *State v. Wood*, 362 S.C. 520, 608 S.E.2d 435 (Ct.App. 2004). This court is bound by the trial court's factual findings

unless they are clearly erroneous. *State v. Quattlebaum,* 338 S.C. 441, 527 S.E.2d 105 (2000); *State v. Landis,* 362 S.C. 97, 606 S.E.2d 503 (Ct.App.). This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases. *Wilson,* 345 S.C. at 6, 545 S.E.2d at 829. On review, we are limited to determining whether the trial judge abused his discretion. *State v. Reed,* 332 S.C. 35, 503 S.E.2d 747 (1998); *State v. Rochester,* 301 S.C. 196, 391 S.E.2d 244 (1990); *see also State v. Corey D.,* 339 S.C. 107, 529 S.E.2d 20 (2000) (an abuse of discretion is a conclusion with no reasonable factual support). This Court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. *Wilson,* 345 S.C. at 6, 545 S.E.2d at 829; *State v. Mattison,* 352 S.C. 577, 575 S.E.2d 852 (Ct.App.2003).

## *LAW/ANALYSIS*

### I. PRIOR BAD ACTS

Over Fletcher's objection, the trial court allowed the State to introduce evidence indicating Jaquan had been abused. Carlos Jenkins, who worked with Fletcher and had known him for four or five years, testified about two incidents that occurred before Jaquan's death.

The first incident Jenkins recalled happened at Fletcher's residence approximately two weeks before Jaquan's death. When Jenkins walked in the house, he heard Jaquan crying. Jenkins found Jaquan in a walker in the attic, which was "real hot." Jenkins took Jaquan outside to cool him off. According to Jenkins, Jaquan was "pouring down sweat like he had just dipped him in a bathtub." He testified that, although the house was air-conditioned, a person in the attic could not feel the air-conditioning in the house because the door to the attic was closed. Jenkins said Fletcher and Perry showed no concern about Jaquan. In fact, Fletcher told Jenkins the house was his and that Jenkins should "mind [his own] business." Jenkins did not see who put Jaquan in the attic (which Fletcher describes as a laundry room) but Jenkins stated that both Fletcher and Perry were home.

The second incident took place at Fletcher's home when Jenkins went to visit Fletcher about three to four weeks prior to Jaquan's death. When Jenkins followed Fletcher to the bedroom, he observed Jaquan lying on his back, crying and screaming, handcuffed by his feet to the foot of the bed. Jenkins unlocked the handcuffs and asked Fletcher and Perry if they were crazy. They "just giggled" at him.

Jenkins did not see who handcuffed Jaquan to the bed. He did not testify he noticed any injuries to Jaquan.

## A. Issue Preservation

Fletcher did not object to the sufficiency of the trial court's ruling on the admissibility of Jenkins' testimony. A trial court's general ruling that evidence was admissible does not constitute reversible error. *State v. McLaughlin,* 307 S.C. 19, 413 S.E.2d 819 (1992) (holding the failure to request a more explicit ruling constitutes a waiver to any objection to the trial courts general ruling). Although Fletcher cannot object to the sufficiency of the trial courts ruling for the first time on appeal, he contends the trial court ruled on the issue during the trial and that erecting a procedural barrier is unnecessary.

Fletcher did not independently object to the evidence on the ground it was less than clear and convincing. However, Perrys counsel objected: "the rib injuries should not come in because there was no clear and convincing evidence as to who inflicted these rib injuries." Fletchers attorney then joined Perrys objection: "For the record, your Honor[,] . . . I would join in his objection."

## B. The Continued Juridical Journey of Rule 404(b) and *State v. Lyle*

Fletcher argues the trial court erred in allowing evidence of the prior bad acts pursuant to Rule 404(b), SCRE, and *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923). Fletcher contends the two incidents were unrelated to the rib injuries and Jaquan's death and claims the incidents were not causally or temporally related. We disagree.

Generally, South Carolina law precludes evidence of a defendants prior crimes or other bad acts to prove the defen-

dants guilt for the crime charged. *State v. Pagan*, 357 S.C. 132, 591 S.E.2d 646 (Ct.App.2004); *State v. Weaverling*, 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999). It is well established that evidence of other crimes or prior bad acts is inadmissible to show criminal propensity or to demonstrate the accused is a bad individual. *State v. Johnson*, 293 S.C. 321, 360 S.E.2d 317 (1987); *see also State v. Beck*, 342 S.C. 129, 536 S.E.2d 679 (2000) (finding that evidence of prior crimes or bad acts is inadmissible to prove bad character of defendant or that he acted in conformity therewith).

■ However, evidence of other crimes is generally admissible when it is necessary to establish a material fact or element of the crime charged. *See Johnson*, 293 S.C. at 324, 360 S.E.2d at 319; *State v. Byers*, 277 S.C. 176, 284 S.E.2d 360 (1981); *State v. Cheatham*, 349 S.C. 101, 561 S.E.2d 618 (Ct.App.2002). Thus, such evidence is admissible when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the proof of the other; or (5) the identity of the person charged with the present crime. *See* Rule 404(b), SCRE; *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923); *see also Anderson v. State*, 354 S.C. 431, 581 S.E.2d 834 (2003) (explaining that Rule 404, the modern expression of the *Lyle* rule, excludes evidence of other crimes, wrongs, or acts offered to prove character of person in order to show action in conformity therewith; the rule creates an exception when testimony is offered to show motive, identity, existence of common scheme or plan, absence of mistake or accident, or intent).

■ If not the subject of a conviction, a prior bad act must first be established by clear and convincing evidence. *Beck*, 342 S.C. at 135, 536 S.E.2d at 683; *State v. Gillian*, 360 S.C. 433, 602 S.E.2d 62 (Ct.App.2004); *see also State v. Tutton*, 354 S.C. 319, 580 S.E.2d 186 (Ct.App.2003) (noting when the appellate court determines whether clear and convincing evidence exists of the prior bad acts, it is bound by the trial courts findings of fact unless they are clearly erroneous). The bad act must logically relate to the crime with which the defendant has been charged. *Beck*, 342 S.C. at 135, 536

S.E.2d at 682–83; *see also State v. King,* 334 S.C. 504, 514 S.E.2d 578 (1999) (declaring that record must support logical relevance between prior bad act and crime for which defendant is accused). In making the determination of whether evidence of prior bad acts is admissible, the trial court must gauge its logical relevancy to the particular purpose for which it is sought to be introduced. *See State v. Nix,* 288 S.C. 492, 343 S.E.2d 627 (Ct.App.1986). If the prior bad act evidence is "logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime." *Id.* at 497, 343 S.E.2d at 630–31 (internal quotations omitted). If there is any evidence to support the admission of prior bad act evidence, the trial judges ruling will not be disturbed on appeal. *Pagan,* 357 S.C. at 143, 591 S.E.2d at 652.

Even if evidence of other crimes is admissible under Rule 404(b), the trial judge must exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Braxton,* 343 S.C. 629, 541 S.E.2d 833 (2001); *Beck,* 342 S.C. at 135–36, 536 S.E.2d at 683; *see also* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one. *State v. Sweat,* 362 S.C. 117, 606 S.E.2d 508 (Ct.App.). The determination of prejudice must be based on the entire record and the result will generally turn on the facts of each case. *Id.* A trial judges decision regarding the comparative probative value and prejudicial effect of relevant evidence should be reversed only in exceptional circumstances. *Id.*

### 1. Common Scheme or Plan Exception

In the present case, the trial judge admitted the evidence of prior abuse under the common scheme or plan exception to Rule 404(b), SCRE, and *State v. Lyle.*

 "A close degree of similarity or connection between the prior bad act and the crime for which the defendant is on trial is required to support admissibility under the common scheme or plan exception." *State v. Cheeseboro,* 346 S.C. 526, 546, 552 S.E.2d 300, 311 (2001). The connection between the prior bad act and the crime must be more than just a general similarity. *State v. Timmons,* 327 S.C. 48, 488 S.E.2d 323 (1997); *State v. Mathis,* 359 S.C. 450, 597 S.E.2d 872 (Ct.App.2004). "A common scheme or plan concerns more than the commission of two similar crimes; some connection between the crimes is necessary." *Timmons,* 327 S.C. at 52, 488 S.E.2d at 325; *see also State v. Ford,* 334 S.C. 444, 513 S.E.2d 385 (Ct.App.1999) (stating that the common scheme or plan exception requires not just similarity of the other acts to the crime charged, but also a close relationship between the crimes); *State v. Moultrie,* 316 S.C. 547, 554, 451 S.E.2d 34, 39 (Ct.App.1994) ("Clear and convincing evidence of prior crimes or bad acts that is logically relevant is ... admissible to prove ... a common scheme or plan that embraces several previous crimes so closely related to each other that proof of one tends to establish the other."). The degree of similarity or remoteness between the prior bad acts and the crime charged should be considered in determining the connection between them. *See, e.g., State v. Raffaldt,* 318 S.C. 110, 456 S.E.2d 390 (1995).

 In deciding whether to admit evidence of prior bad acts, courts must weigh the probative value of evidence of prior bad acts against its prejudicial effect. *State v. McClellan,* 283 S.C. 389, 323 S.E.2d 772 (1984). Where the evidence of the bad acts is so similar to the charged offense that the previous act enhances the probative value of the evidence so as to outweigh its prejudicial effect, it is admissible. *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999). However, even if the evidence is clear and convincing and falls within a *Lyle* exception, the trial judge must exclude it if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* Thus, "[s]uch evidence is inadmissible unless the close similarity of the charged offense and the previous act[s] enhances the probative value of the evidence so as to overrule the prejudicial effect." *McClellan,* 283 S.C. at 392, 323 S.E.2d at 774.

In *State v. Pierce*, 326 S.C. 176, 485 S.E.2d 913 (1997), the supreme court ruled testimony about the rough treatment of the child one year before the childs death was not admissible under the common scheme or plan exception because of the lack of a connection between the incident and the crime of homicide by child abuse. *Id.* at 178–79, 485 S.E.2d at 914. This case is distinguishable from *Pierce.* Here, one of the alleged prior incidents of abuse occurred only three to four weeks before Jaquans death and the other incident of abuse took place merely two weeks prior to his death.

Our supreme court has held that evidence of a prior conviction for assault and battery of a high and aggravated nature of a boy was not admissible in a later prosecution for homicide by child abuse of the boys sister because the type of injury was dissimilar. *State v. Smith*, 322 S.C. 107, 470 S.E.2d 364 (1996). In the present case, although the type of abuse is dissimilar, the victim of the prior incidents and the victim of the alleged homicide by child abuse are the same.

This court, in *State v. Henry*, 313 S.C. 106, 432 S.E.2d 489 (Ct.App.1993), determined evidence of abuse against one of the stepdaughters was admissible because both she and the victim experienced similar acts of abuse by the defendant which occurred in the same places and during the same time frame. *Id.* at 108, 432 S.E.2d at 491. Evidence of abuse against another stepdaughter was not admissible because she was not subjected to the alleged abusive conduct to the extent of her sisters. *Id.*

In the case *sub judice,* the prior bad acts evidence was relevant to the existence of a common scheme or plan of child abuse and neglect. The evidence demonstrates by clear and convincing proof the occurrence of the prior bad acts. Additionally, the probative value of the evidence regarding the prior abuse outweighs the prejudicial effect of admitting the evidence. *See State v. Beck*, 342 S.C. 129, 136, 536 S.E.2d 679, 683 (2000) ("After conducting a *Lyle* analysis and finding evidence both relevant and admissible as a prior bad act, the trial court must conduct a Rule 403, SCRE analysis to determine whether or not the evidence is unduly prejudicial."). Thus, the trial judge did not err in admitting Jenkins testimo-

ny under the common scheme or plan exception to Rule 404(b), SCRE and *State v. Lyle.*

## 2. Intent/Absence of Mistake or Accident/Identity

Evidence of prior bad acts may be admissible to prove intent or absence of mistake or accident. *See, e.g., State v. Key,* 277 S.C. 214, 284 S.E.2d 781 (1981); *State v. Turbeville,* 275 S.C. 534, 273 S.E.2d 764 (1981). Further, prior bad acts evidence is admissible if necessary to establish a material fact or element of the crime charged. *See, e.g., State v. Bell,* 302 S.C. 18, 393 S.E.2d 364 (1990); *State v. Johnson,* 293 S.C. 321, 360 S.E.2d 317 (1987); *State v. Gillian,* 360 S.C. 433, 602 S.E.2d 62 (Ct.App.2004).

A person who causes the death of a child under the age of eleven while committing child abuse or neglect, when the death occurs under circumstances manifesting an extreme indifference to human life, is guilty of homicide by child abuse. S.C.Code Ann. 16–3–85(A)(1) (2003). "Extreme indifference is in the nature of a culpable mental state ... and therefore is akin to intent." *State v. Jarrell,* 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct.App.2002) (internal quotations omitted).

In addition, evidence identifying the perpetrator may be admissible. *State v. Forney,* 321 S.C. 353, 468 S.E.2d 641 (1996) (finding court properly admitted evidence the defendant acted as gunman in stealing a car two hours before allegedly committing murder); *State v. Good,* 315 S.C. 135, 432 S.E.2d 463 (1993) (noting that evidence of prior conviction for burglary of similar items from the same residence against the same victim as the robbery and murder for which defendant was charged was admissible). Fletcher asserts the present case is distinguishable from *Forney* and *Good* because of the temporal closeness of events in *Forney* and the unique similarities in the crimes and bad acts in *Good.* Given the nature of the crime in the present case, the prior incidents are sufficiently related in time and in similarity. Fletcher claimed he was not at home when the fatal injuries were inflicted. Perrys witnesses testified they saw no injuries before Jaquans death and described Perry as a loving mother. In support of identifying the perpetrator, the evidence of prior bad acts was used to demonstrate that Fletcher was at home. The evidence was

probative as to the fundamental element of identity pursuant to Rule 404(b) and *Lyle*.

The prior bad acts evidence, the alleged incidents of abuse, was admissible under the intent, absence of mistake or accident, and identity exceptions to Rule 404(b) and *Lyle*. The evidence was necessary to establish a material fact or element of the crime charged. The trial court did not abuse its discretion in allowing Jenkins testimony.

### C. Res Gestae

Fletcher contends the trial court erred in allowing evidence of the prior bad acts under the *res gestae* doctrine. We disagree.

Evidence of bad acts or other crimes may be admitted under the res gestae theory:

> One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the res gestae" or the "uncharged offense is so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other … [and is thus] part of the res gestae of the crime charged."

*State v. Adams*, 322 S.C. 114, 122, 470 S.E.2d 366, 370–71 (1996) (quoting *United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980)). When evidence is admissible to provide this "full presentation" of the offense, there is "no reason to fragmentize the event under inquiry by suppressing parts of the res gestae." *Adams*, 322 S.C. at 122, 470 S.E.2d at 371 (internal quotations omitted). The res gestae theory recognizes that evidence of other bad acts may be an integral part of the crime with which the defendant is charged or may be needed to aid the fact finder in understanding the context in which the crime occurred. *State v. Owens*, 346 S.C. 637, 552 S.E.2d 745 (2001); *State v. Wood*, 362 S.C. 520, 608 S.E.2d 435 (Ct.App.).

Under this theory, it is important that the temporal proximity of the prior bad act be closely related to the charged crime. *Owens,* 346 S.C. at 652, 552 S.E.2d at 753. Even if the evidence is relevant under this theory, prior to admission the trial judge should determine whether its probative value clearly outweighs any unfair prejudice. Rule 403, SCRE; *State v. Bolden,* 303 S.C. 41, 398 S.E.2d 494 (1990).

Fletcher alleges the prior incidents of abuse were neither factually nor temporally related to the charged crime. In this case, the time period and similarity of the incidents involved must be examined overall because of the nature of the crime charged. The overall view of the facts provides the context in which the crime occurred and demonstrates the culminating impact on Jaquan. The medical testimony indicated the injuries occurred over a period of time. The prior incidents were temporally related, occurring close in time to Jaquans death. The incidents were relevant to establishing Fletchers state of mind and whether he manifested an extreme indifference to human life.

The alleged child abuse occurred in the two weeks during which Jaquans ribs were fractured and within days of when the abdominal trauma was inflicted. Extreme indifference to a human life was an element of the crime charged. The evidence of incidents occurring during the same time period as the injuries leading to Jaquans death established Perry and Fletchers extreme indifference to Jaquans life.

The evidence was necessary to establish the crime charged. Admission of the testimony was essential and relevant to a full presentation of the evidence in this case. The testimony regarding the prior bad acts was relevant to show the complete, whole, unfragmented story relating to the charge of homicide by child abuse. Moreover, the probative value of the evidence outweighed its prejudicial effect. *See Owens,* 346 S.C. at 653, 552 S.E.2d at 753. The trial court did not err in admitting the evidence of alleged prior abuse under the *res gestae* doctrine.

## D. Harmless Error

Assuming arguendo the trial judge erred in admitting Jenkins' testimony, we find such error was harmless.

248

Whether an error is harmless depends on the circumstances of the particular case. *In re Harvey,* 355 S.C. 53, 584 S.E.2d 893 (2003); *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998); *State v. Thompson,* 352 S.C. 552, 575 S.E.2d 77 (Ct.App.2003). No definite rule of law governs this finding. *State v. Pagan,* 357 S.C. 132, 591 S.E.2d 646 (Ct.App. 2004). Rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. *State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985).

Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey,* 355 S.C. at 63, 584 S.E.2d at 897; *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151; *State v. Burton,* 326 S.C. 605, 486 S.E.2d 762 (Ct.App. 1997). Where a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed. *State v. Pickens,* 320 S.C. 528, 466 S.E.2d 364 (1996); *Thompson,* 352 S.C. at 562, 575 S.E.2d at 83; *State v. King,* 349 S.C. 142, 561 S.E.2d 640 (Ct.App.2002). Error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained. *Arnold v. State,* 309 S.C. 157, 420 S.E.2d 834 (1992).

Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard,* 303 S.C. 172, 399 S.E.2d 595 (1991); *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989); *Adams,* 354 S.C. at 381, 580 S.E.2d at 795; *see also State v. Kelley,* 319 S.C. 173, 460 S.E.2d 368 (1995) (noting that when guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside conviction for insubstantial errors not affecting result). The admission of improper evidence is harmless where the evidence is merely cumulative to other evidence. *State v. Haselden,* 353 S.C. 190, 577 S.E.2d 445 (2003); *State v. Braxton,* 343 S.C. 629, 541 S.E.2d 833 (2001); *State v. Blackburn,* 271 S.C. 324, 247 S.E.2d 334 (1978); *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999); *see*

*also State v. Williams,* 321 S.C. 455, 469 S.E.2d 49 (1996) (instructing that error in admission of evidence is harmless where it is cumulative to other evidence which was properly admitted); *State v. Schumpert,* 312 S.C. 502, 435 S.E.2d 859 (1993) (explicating that any error in admission of evidence cumulative to other unobjected-to evidence is harmless).

Any error in the admission of the prior bad acts testimony is harmless beyond a reasonable doubt given the overwhelming evidence of guilt in this case. Extensive medical testimony was admitted describing Jaquan's rib fractures (injuries which did not lead directly to Jaquan's death but demonstrated a pattern of child abuse in the weeks before it). Fletcher does not argue this evidence was prejudicial. Thus, Jenkins' testimony, irrespective of its detail, was merely cumulative to other evidence of child abuse and, therefore, harmless.

## II. SEARCH WARRANT

During the investigation, the police obtained a warrant to search the home of Perry and Fletcher, seeking "[p]hotographs of the residence ... [and] any evidence of abusive behavior towards the children of the residence." The affidavit did not specify police suspected child abuse, but it specifically described the situation: Perry brought nine-month-old Jaquan to the hospital; the child arrived in respiratory arrest; the child died; Perry told investigators Jaquan fell from a bed; Perry later noticed Jaquan was not breathing; examination of the child revealed bruises on his back and abdomen; the cause of death was unknown; and police believed examination of the residence might lead to the discovery of information that would assist investigators in determining the child's cause of death.

The police officers searched the home and seized a bed frame, a mattress, and a set of handcuffs. Before trial, Fletcher moved to suppress the evidence obtained pursuant to the search warrant, alleging a lack of probable cause that particular evidence would be found at the residence and lack of particularity as to what items were sought. At the motions hearing, the officer who obtained the warrant testified he may have told the magistrate that police suspected child abuse, but no other evidence suggested the officer was under oath when

he gave the magistrate this information. The motion to suppress was denied and the photographs and handcuffs were entered into evidence at trial.

 Fletcher failed to object at trial to the admission of the photographs. Making a motion in limine to exclude evidence at the beginning of trial does not preserve an issue for review because a ruling in limine is not a final determination. *State v. Forrester,* 343 S.C. 637, 541 S.E.2d 837 (2001); *State v. King,* 349 S.C. 142, 561 S.E.2d 640 (Ct.App.2002). Thus, the moving party must make a contemporaneous objection when the evidence is introduced. *Id.; see also State v. Mitchell,* 330 S.C. 189, 193 n. 3, 498 S.E.2d 642, 644 n. 3 (1998) ("We have consistently held a ruling in limine is not final, and unless an objection is made at the time the evidence is offered and a final ruling procured, the issue is not preserved for review.") (citation omitted); *State v. Floyd,* 295 S.C. 518, 521, 369 S.E.2d 842, 843 (1988) ("We caution Bench and Bar that these pre-trial motions are granted to prevent prejudicial matter from being revealed to the jury, but do not constitute final rulings on the admissibility of evidence."). Unless an objection is made at the time the evidence is offered and a final ruling procured, the issue is not preserved for review. *State v. Owens,* 346 S.C. 637, 552 S.E.2d 745 (2001). Because Fletcher failed to renew his objection, the issue was not properly preserved.

 In addition, Fletcher did not join Perry's argument for suppression of the evidence on the ground of insufficient probable cause. A defendant cannot bootstrap an issue for appeal via his co-defendant's objection. *State v. Carriker,* 269 S.C. 553, 238 S.E.2d 678 (1977); *State v. Brannon,* 347 S.C. 85, 552 S.E.2d 773 (Ct.App.2001). The probable cause issue Fletcher raises may not have been properly preserved.

## A. Probable Cause

 Adverting to the merits, Fletcher asserts the search warrant affidavit did not contain sufficient facts to constitute probable cause to believe evidence of a crime would be found at the residence. We disagree.

A magistrate may issue a search warrant only upon a finding of probable cause. *State v. Tench,* 353 S.C. 531, 579 S.E.2d 314 (2003); *State v. Bowie,* 360 S.C. 210, 600 S.E.2d 112 (Ct.App.2004). A probable cause determination requires the magistrate to analyze the totality of the circumstances, meaning he should make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Bowie,* 360 S.C. at 219, 600 S.E.2d at 116–17. Probable cause is a flexible, common-sense standard. *Bowie,* 360 S.C. at 220, 600 S.E.2d at 117. The term "probable cause" does not import absolute certainty. *Id.* In determining whether a search warrant should be issued, magistrates are concerned with probabilities and not certainties. *Id.*

"The South Carolina General Assembly has enacted a requirement that search warrants may be issued 'only upon affidavit sworn to before the magistrate . . . establishing the grounds for the warrant.'" *State v. Bellamy,* 336 S.C. 140, 143, 519 S.E.2d 347, 348 (1999) (quoting S.C.Code Ann. § 17–13–140 (1985)). The affidavit must contain sufficient underlying facts and information upon which the magistrate may make a determination of probable cause. *State v. Dupree,* 354 S.C. 676, 583 S.E.2d 437 (Ct.App.2003); *State v. Philpot,* 317 S.C. 458, 454 S.E.2d 905 (Ct.App.1995). Affidavits are not meticulously drawn by lawyers, but are normally drafted by non-lawyers in the haste of a criminal investigation, and should therefore be viewed in a common sense and realistic fashion. *State v. Sullivan,* 267 S.C. 610, 230 S.E.2d 621 (1976); *Dupree,* 354 S.C. at 683, 583 S.E.2d at 441. Affidavits must be judged on the facts presented and not on the precise wording used. *Bowie,* 360 S.C. at 220, 600 S.E.2d at 117.

The magistrate should determine probable cause based on all of the information available to the magistrate at the time the warrant is issued. *State v. Crane,* 296 S.C. 336, 372 S.E.2d 587 (1988); *State v. Driggers,* 322 S.C. 506, 473 S.E.2d 57 (Ct.App.1996). In determining the validity of the warrant, a reviewing court may consider only information

brought to the magistrate's attention. *Bowie,* 360 S.C. at 219, 600 S.E.2d at 116.

An appellate court reviewing the decision to issue a search warrant must decide whether the magistrate had a substantial basis for concluding probable cause existed. *Bowie,* 360 S.C. at 216, 600 S.E.2d at 115; *Dupree,* 354 S.C. at 683, 583 S.E.2d at 441; *State v. King,* 349 S.C. 142, 561 S.E.2d 640 (Ct.App.2002); *see also State v. 192 Coin–Operated Video Game Machs.,* 338 S.C. 176, 525 S.E.2d 872 (2000) (finding that as long as the magistrate had a substantial basis for concluding a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more). This review, like the determination by the magistrate, is governed by the "totality of the circumstances" test. *State v. Jones,* 342 S.C. 121, 536 S.E.2d 675 (2000); *King,* 349 S.C. at 148, 561 S.E.2d at 643. The appellate court should give great deference to a magistrate's determination of probable cause. *State v. Weston,* 329 S.C. 287, 494 S.E.2d 801 (1997); *Driggers,* 322 S.C. at 510, 473 S.E.2d at 59; *see also Sullivan,* 267 S.C. at 617, 230 S.E.2d at 624 (elucidating that magistrate's determination of probable cause should be paid great deference by reviewing court). Searches based on warrants will be given judicial deference to the extent an otherwise marginal search may be justified if it meets a realistic standard of probable cause. *State v. Bennett,* 256 S.C. 234, 182 S.E.2d 291 (1971).

Based on the totality of the circumstances, the affidavit provided the magistrate with a substantial basis for finding probable cause to search the home of Fletcher and Perry. *See Weston,* 329 S.C. at 291, 494 S.E.2d at 803 (finding duty of reviewing court is simply to ensure that magistrate had substantial basis for concluding probable cause existed). The affidavit edifies: (1) that Perry claimed Jaquan fell out of bed in the morning and was brought to the hospital because he stopped breathing; and (2) that there were bruises on the child. Concomitantly, the suspicion of child abuse is not only implicit but is verifiable. This suspicion supported the magistrate's finding of probable cause. Thus, the warrant is valid. Because investigators searched the residence pursuant to a valid warrant, the trial court properly refused to suppress the evidence, including the handcuffs and photographs, found in the search.

## B. Scope of the Search Warrant

 Fletcher claims the affidavit did not describe with sufficient particularity the property to be seized, and the trial court erred in refusing to suppress evidence resulting from an invalid search warrant. We disagree.

 To pass constitutional muster, a search warrant shall not be issued unless it particularly describes "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also* S.C. Const. art. I, § 10 ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained."). An objective of this "particular description" requirement is to prevent general warrants—those authorizing "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The South Carolina Code requires a warrant "identifying the property" to be seized. S.C.Code Ann. § 17–13–140 (2003). The statute requires no more than the state and federal constitutions, both of which require warrants to particularly describe the things to be seized. *State v. Williams,* 297 S.C. 404, 377 S.E.2d 308 (1989). "[T]he particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and ... a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *State v. Sullivan,* 281 S.C. 522, 524, 316 S.E.2d 404, 406 (1984) (internal quotations omitted); *see also United States v. Osborne,* 630 F.2d 374, 377 (5th Cir.1980) (upholding a warrant authorizing the seizure of several described items and "any other evidence relating to the armed robbery"); *State v. Malloy,* 409 N.W.2d 707, 708 (Iowa Ct.App.1987) (approving a warrant authorizing the seizure of specified items as well as "evidence of instrumentalities which would substantiate abuse or neglect").

The warrant in the instant case was limited to evidence of abusive behavior toward the children. The exact characteris-

tics of the evidence were unknown to investigators. However, requiring a more detailed description would unreasonably thwart an investigation. The warrant did not authorize a search for evidence of other crimes and its scope was properly limited. Therefore, it was not fatally general. The trial court did not err in allowing evidence found pursuant to the valid search.

 Even if the evidence was erroneously admitted, the error is harmless beyond a reasonable doubt because it could not have impacted the jury's verdict. *See State v. McKnight,* 352 S.C. 635, 576 S.E.2d 168 (2003); *see also State v. Tench,* 353 S.C. 531, 579 S.E.2d 314 (2003) (noting the erroneous admission of evidence may be harmless if it did not affect the outcome of the trial); *Arnold v. State,* 309 S.C. 157, 420 S.E.2d 834 (1992) (stating error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained). The State established homicide by child abuse by overwhelming evidence, including the medical testimony which proved the injuries could not have been accidental and the child's obvious pain would have indicated he needed medical attention long before Fletcher and Perry took him to the hospital. In addition, Fletcher admitted the handcuffs belonged to him. Even the erroneous admission of the handcuffs could not have affected the jury's verdict.

## III. CONFRONTATION CLAUSE

Both Perry and Fletcher provided statements to investigators. At a pre-trial hearing pursuant to *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Fletcher requested the trial court redact the following from Perrys September 22, 2000 statement:

Q. What was Jaquan handcuffed to?

A. He was handcuffed to the bottom rail of the bed.

Q. Which bed was Jaquan handcuffed to?

A. The bed in my room, the one in there now. He [sic] friend Carlos came in the house and took the handcuffs off and told Henry he shouldnt do that.

The trial court redacted the reference to Carlos as "he friend" and the reference to Fletcher in the second answer.

The second response then stated: "The bed in my room, the one in there now. Carlos came in the house and took the handcuffs off." The trial court redacted references to other handcuffing incidents and Perrys statement that Fletcher beat Jaquan with a belt. The trial judge provided the jury with a limiting instruction when the statements were introduced and with a similar instruction when he charged the jury on the law.

## A. Redacted Statement of Perry

Fletcher submits the trial court erred by failing to adequately redact Perrys statement, which violated the sixth and fourteenth amendments to the United States Constitution and article one, section fourteen of the South Carolina Constitution. We disagree.

"The constitutional right to confront and cross examine witnesses is essential to a fair trial in that it promotes reliability in criminal trials and insures that convictions will not result from testimony of individuals who cannot be challenged at trial." *State v. Martin*, 292 S.C. 437, 439, 357 S.E.2d 21, 22 (1987). The introduction of a non-testifying co-defendants statement which implicates a defendant violates a defendants right to confrontation because no opportunity to cross-examine the co-defendant is presented. *Bruton*, 391 U.S. at 137, 88 S.Ct. 1620. Because the right to confrontation is so fundamental, limiting instructions are not an adequate substitute. *Id.; see also State v. Dennis*, 337 S.C. 275, 523 S.E.2d 173 (1999) (recognizing that in *Bruton*, the Supreme Court held that a defendants rights under the Confrontation Clause of the Sixth Amendment are violated by the admission of a non-testifying co-defendants confession that inculpates a defendant, even if a cautionary instruction is given).

Redaction has come into play as a tool to allow admission of a co-defendants confession against the confessor in a joint trial. *State v. Holmes*, 342 S.C. 113, 536 S.E.2d 671 (2000). The point of redaction is to permit the confession to be used against the non-testifying confessor, while avoiding implicating his co-defendant. *Id.* The Confrontation Clause is not violated when a defendants name is redacted but other evidence links the statements application to the defendant, if a

proper limiting instruction is given. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (holding "the Confrontation Clause is not violated by the admission of a nontestifying codefendants confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendants name, but any reference to his or her existence.").

The redacted version of Perrys statement neither mentions nor implicates Fletcher. Unlike the defendant in *Bruton*, Fletcher was not named as a participant in the crime. *See Richardson*, 481 U.S. at 208, 107 S.Ct. 1702 (distinguishing *Bruton* in a case in which the confession was not incriminating on its face).

Based on *Richardson*, Fletchers right to confrontation was not violated. The statement that Jaquan was handcuffed indicates someone other than Perry may have handcuffed the child but does not necessarily implicate Fletcher. Therefore, Perry was not a witness against Fletcher and no violation of his right to confront a witness against him occurred. *See State v. Evans*, 316 S.C. 303, 450 S.E.2d 47 (1994) (finding a co-defendants statement admissible where, although the statements incriminating import was inferable from other evidence properly admitted against the defendant, the statement did not on its face incriminate the defendant). Because the trial court adequately redacted Perrys statement and gave a proper limiting instruction to the jury, Fletchers right to confrontation was not violated.

### B. Cross–Examination by Perry

■ The State introduced a statement Perry gave to police officers. Perry did not testify, but Perrys counsel used her statement in cross-examining Fletcher. After Fletcher said Perry was home during the alleged handcuffing incident and denied Perry cussed him out or told him not to handcuff Jaquan to the bed, counsel for Perry referred to Perrys statement. Fletchers attorney objected. The trial court overruled the objection. Fletcher, as instructed by Perrys counsel, read from Perrys statement:

A. "What was Jaquan doing that was so bad?"

Q. All right. Here. And the answer is?

A. I dont know what the last word is.

Q. But what does it say?

A. I came home; Jaquan was in the—

Q. All right. And whats the next question; the next question?

A. "What was Jaquan handcuffed to?"

Q. And what does it say here? What is the answer?

A. "He was handcuffed to the bottom rail of the bed."

Q. So your story is that Ms. Perry was there?

A. Yes, sir.

Q. And you deny that she came home and witnessed this and cussed you out about this?

A. Yes, sir.

Fletcher complains the use of Perrys statement in cross-examining him improperly "pitted him against [Perrys] previous statement" and the trial court erred in overruling his objection.

The record shows Fletcher raised a general objection to the publication of Perrys statement by Fletcher. When Perrys counsel asked Fletcher to read from Perrys statement, Fletchers attorney declared: "Ill object to having [Fletcher] publish another persons statement." The judge overruled the objection. It is well settled that an objection must be on a specific ground. *State v. Hamilton*, 344 S.C. 344, 543 S.E.2d 586 (Ct.App.2001). To be preserved for appellate review, an objection should be sufficiently specific to bring into focus the precise nature of the alleged error. *Id.* The objection here lacks specificity. Fletcher did not present the trial judge with the issue of "pitting" witnesses based on this colloquy. This issue is not preserved for our review.

## IV. PHOTOGRAPHS

During the trial, the State, over Fletchers objection, was allowed to introduce post-mortem photographs of Jaquan when the trial court found them "admissible under 403." The photographs depicted Jaquans external injuries. The photograph labeled States Exhibit 1 shows Jaquan on a hospital

gurney, unclothed, with a tube in his mouth, as well as gauze and an unidentified incision near the genital area (related to medical intervention). The other photographs depict bruises on Jaquans body.

Fletcher asseverates the photographs were calculated to arouse the sympathy or prejudice of the jury and were irrelevant. He argues there was little probative value to States Exhibit 1 and several of the photographs showing bruises were irrelevant, unnecessary to substantiate material facts, and inflammatory in nature.

Perrys attorney noted his objection but did not state a ground. He declared: "We would object to those." A general objection which does not specify the particular ground on which the objection is based is insufficient to preserve the issue for review. *State v. New*, 338 S.C. 313, 526 S.E.2d 237 (Ct.App.1999). During the bench conference, neither Perry nor Fletcher asked to place a ground for the objection on the record. An objection made during an off-the-record conference which is not made part of the record does not preserve the question for review. *State v. Hamilton*, 344 S.C. 344, 543 S.E.2d 586 (Ct.App.2001). In addition, an issue is not preserved for appeal merely because the trial judge mentions it. *See, ie.g., Mize v. Blue Ridge Ry. Co.*, 219 S.C. 119, 64 S.E.2d 253 (1951). Fletcher contends the trial courts ruling on the matter indicates a specific objection was made off the record, and because the trial court ruled on the record, the error was preserved. Fletcher made no independent objection on the record. He concurred in the objection of Perrys counsel. Furthermore, the trial courts mentioning the issue does not preserve it for appeal. Thus, the issue is not preserved for our review. In addition, we disagree with Fletchers substantive argument.

The relevance, materiality, and admissibility of photographic evidence are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion. *State v. Haselden*, 353 S.C. 190, 577 S.E.2d 445 (2003); *State v. Rosemond*, 335 S.C. 593, 518 S.E.2d 588 (1999); *see also State v. Kelley*, 319 S.C. 173, 460 S.E.2d 368 (1995) (stating that trial judge has considerable latitude in ruling on admissibility of evidence and his rulings

will not be disturbed absent showing of probable prejudice). The trial judge must balance the prejudicial effect of graphic photographs against their probative value. *State v. Vang,* 353 S.C. 78, 577 S.E.2d 225 (Ct.App.2003). A trial judges decision regarding the comparative probative value and prejudicial effect of relevant evidence should be reversed only in exceptional circumstances. *State v. Hamilton,* 344 S.C. 344, 543 S.E.2d 586 (Ct.App.2001). Admitting photographs which serve to corroborate testimony is not an abuse of discretion. *See State v. Tucker,* 324 S.C. 155, 478 S.E.2d 260 (1996); *State v. Jarrell,* 350 S.C. 90, 564 S.E.2d 362 (Ct.App.2002). However, photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions. *State v. Brazell,* 325 S.C. 65, 480 S.E.2d 64 (1997). "To constitute unfair prejudice, the photographs must create a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Kelley,* 319 S.C. at 178, 460 S.E.2d at 370–71 (quoting *State v. Alexander,* 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991)).

The photographs were introduced to corroborate the testimony of witnesses who saw Jaquans injuries at or near the time of his death. The pictures demonstrated the trauma occurred over a period of time because they showed the discoloration of the bruises. The photographs were necessary to depict the severity of the bruises and the resultant trauma, which were inconsistent with those resulting from an accident or play. They indicated the presence of internal injuries (e.g., the distended abdomen indicated rib fractures). The photographs corroborated testimony that the cause of death was child abuse and the abuse manifested an extreme indifference to human life. The photographs were relevant and necessary and were not inflammatory or calculated to illicit sympathy or prejudice of the jury. Therefore, the trial court did not abuse its discretion in admitting the photographs.

## CONCLUSION

Based on the foregoing, the conviction of Fletcher is **AFFIRMED.**

STILWELL and SHORT, JJ., concur.